**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

FILED

01 OCT -5 PM 4:43

U.␣␣␣␣␣␣␣␣␣␣␣␣␣␣␣
N.D. OF ALABAMA

| | |
|---|---|
| DIANE BHONES, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) |
| | ) |
| DELPHI AUTOMOTIVE SYSTEMS, | ) |
| L.L.C, d/b/a DELPHI SAGINAW | ) |
| STEERING SYSTEMS, | ) |
| | ) |
| **Defendant.** | ) |

Civil Action No. CV-99-S-2912-NE

ENTERED

OCT - 5 2001

## MEMORANDUM OPINION

Plaintiff, Diane Bhones, alleges that her employer violated the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, by denying her reasonable accommodations for medical conditions which she considers disabling. She also asserts that similarly situated male employees with disabilities were reasonably accommodated, and that she therefore was subjected to disparate treatment on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The action presently is before the court on defendant's motion for summary judgment (doc. no. 47). Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that the motion is due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery



and upon motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265

(1986).

The moving party bears the initial burden of showing the court, by reference to materials on

file, that no genuine issues of material fact exist to be decided at trial. *See, e.g., id.* at 323, 106 S.Ct.

at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The movant discharges

this burden by "showing" or "pointing out" to the court that there is an absence of evidence to

support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir.

1995) *(per curiam)*. Rule 56 permits the movant to discharge this burden with or without supporting

affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the

pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d

at 593. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead,

"there must be enough of a showing that the jury could reasonably find for that party." *Walker v.*

*Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

When deciding whether the moving party has met its burden, the court is obligated to draw

all inferences from the evidence presented in the light most favorable to the non-moving party and,

also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256

(11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere

general allegations which do not reveal detailed and precise facts will not prevent the award of

summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th

Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of*

2

*Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493,

1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference

from the facts, and if that inference introduces a genuine issue of material fact, then the court should

not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*,

835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the

"evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*,

64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510,

91 L.Ed.2d 202 (1986)).

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City*

*of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (internal marks and citations omitted)); *see also United*

*States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). The

bottom line is "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477

U.S. at 251-52, 106 S.Ct. at 2512.

## II. BACKGROUND

### A.   Plaintiff's Employment

Diane Bhones was hired by defendant, Delphi Automotive Systems, L.L.C., in August of 1996.[1]  Delphi owns a manufacturing facility in Athens, Alabama, doing business under the name "Delphi Saginaw Steering Systems."  Plaintiff worked at that plant as a production supervisor.  She held that position on a trial basis until October of 1997, when she attained "regular, active" employee status.[2]

Plaintiff was assigned to work primarily in "Department 47," where employees completed welding operations and produced various automotive components with the use of small machinery.  The duties of a Department 47 production supervisor include ensuring that component production schedules are met, scheduling employee work shifts, assisting in employee discipline, and walking through all areas of the department, to more effectively assist employees and ensure that machines are running properly.[3]  Plaintiff contends that the position required her to be on her feet for the majority of her shift, walking on concrete floors.[4]

### B.   Plaintiff's Medical Condition

Plaintiff was diagnosed in 1998 as suffering from fibromyalgia, a syndrome characterized by chronic pain in the muscles, joints, ligaments, and tendons.[5]  The following year, osteoarthritis was added to her diagnosis.  This disease, also known as "degenerative joint disease," is the most

---

[1] Defendant's evidentiary submission (doc. no. 50), Exhibit A (plaintiff's deposition), at 59.  Delphi Automotive Systems, L.L.C., was formerly a division of General Motors, Incorporated.

[2] *Id.* at 86.

[3] *Id.* at 87-88, 122.

[4] *Id.* at 122.

[5] Dorland's Illustrated Medical Dictionary 626, 1085 (28th ed. 1994).  (Plaintiff testified that she occasionally suffers from severe headaches, which she attributes to this affliction.)

common type of arthritis, and it is associated with deterioration of cartilage in the joints.[6] Plaintiff asserts that these conditions rendered her unable to perform the duties of production supervisor without reasonable accommodation from her employer.

## C.    Conflicting Medical Opinions Regarding Plaintiff's Ability to Work

Dr. Angela Sommerset, plaintiff's family physician, frequently signed notes stating that plaintiff's conditions rendered her unable to return to work for intermittent periods of time.[7] Dr. Sommerset noted that the standing and walking requirements of plaintiff's position, coupled with her obesity, exacerbated the stress on her joints.[8] Dr. Sommerset suggested that plaintiff be limited to a desk job.[9] On the other hand, the medical director of defendant's plant, Dr. Thomas Pace, also examined plaintiff and concluded that she should have been able to perform the duties of a production supervisor.[10]

In light of these contradictory opinions, defendant arranged for plaintiff to undergo an independent medical evaluation on May 12, 1998.[11] The exam was conducted by Dr. Eric Beck, a physician who conducts impairment and disability evaluations, in addition to providing rehabilitative therapy.[12] His examination notes recorded daily activities that were quite inconsistent with plaintiff's allegations of disability.

---

[6] *Id*. 1199.

[7] Defendant's evidentiary submission (doc. no. 50), Exhibit A (plaintiff's deposition), at 220-222. Dr. Sommerset's notes also indicate that plaintiff was not happy working at Delphi, and that she considered quitting her job in order to "just ... be[] a housewife at home." *Id*., Exhibit C (Sommerset deposition), attachment 3. On another occasion, the doctor noted that, "she is basically working a job where she is not happy. She feels ... that she is working because this is what her husband wants her to do." *Id*., attachment 5.

[8] *Id*., Exhibit C (Sommerset deposition), at 58-60. Dr. Sommerset stated that plaintiff was approximately one hundred pounds overweight, and this contributed to the pain she was experiencing in her joints. *Id*. at 59.

[9] *Id*. at 42, 58.

[10] *Id*., Exhibit L (Dr. Pace affidavit), at ¶ 2.

[11] *Id*., Exhibit K (Fuller affidavit), at ¶ 6, attachment B (May 12, 1998 report).

[12] *Id*., Exhibit C (Sommerset deposition), at 34.

5

> The patient states that she works out in a gym, biking 15-20 minutes at a time, walking 15-20 minutes at a time, and doing aerobics of one hour's duration two to three times per week. She is not engaged in weight-lifting. She is independent in activities of daily living. She can do light housework, laundry, and cooking. She drives a car and drove here today from Madison. The patient has not worked since 3-18-98. She works as a manufacturing supervisor for Saginaw Steering Systems. ... This involves walking and supervising people.[13]

Dr. Beck concluded that, based upon plaintiff's self-reported daily activities, coupled with a "completely normal physical examination," she was able to perform the duties required of a production supervisor.[14]

Despite Dr. Beck's evaluation and conclusion that plaintiff was able to return to work, she remained on leave until November 10, 1998, when defendant's benefits center discontinued disability payments due to her physician's failure to provide proper documentation.[15]

**D.    Plaintiff's Limitations**

Shortly after plaintiff's return to work in November of 1998, Dr. Pace scheduled plaintiff for a functional capacity evaluation.[16] Dr. Beck performed this evaluation on December 9, 1998, and concluded that plaintiff should be able to perform her duties with minimal restrictions.[17] He saw "no evidence of a connective tissue disorder other than medial and lateral joint line tenderness in the left knee," and observed "no evidence of loss of range of motion in any of the joints of the extremities."[18]

Dr. Beck also indicated that plaintiff had magnified her symptoms, exaggerated the degree

---

[13] *Id.,* Exhibit K (Fuller affidavit), exhibit B (Dr. Beck's report).

[14] *Id.*

[15] *Id.,* Exhibit K (Fuller affidavit) at ¶ 3. Plaintiff has been absent from work for more than two of the last four years. (*Id.* at ¶¶ 3, 8.)

[16] *Id.* at ¶ 5.

[17] *Id.,* Exhibit C (Sommerset deposition), attachment 1 (Beck evaluation).

[18] *Id.*

of pain she allegedly was experiencing, and did not give a "valid effort" during the exam.[19] He concluded that plaintiff could: occasionally lift 40 pounds; frequently lift 15 pounds; engage in occasional bending, stooping, twisting, and overhead work; sit for 2 hours at a time; stand for 2 hours at a time; and walk for 2 hours at a time.[20]

Significantly, plaintiff's family physician, Dr. Sommerset, testified that, despite her contrary conclusion regarding plaintiff's functional capacity, Dr. Beck was more qualified than she to assess plaintiff's ability to perform her job duties and assign restrictions.[21]

Dr. Pace reviewed Dr. Beck's findings in conjunction with the physical exertion requirements of a production supervisor, and informed Harry Fuller, defendant's human resource manager, that plaintiff was capable of returning to her job.[22] Dr. Pace then discussed the results with plaintiff and informed her that she could work an eight-hour day as a production supervisor.[23] Plaintiff, however, disagreed with Dr. Beck's medical opinion, and in January of 1999, informed Fuller that she could not perform her job.[24]

### E.   Attempts at Accommodation

Despite the fact that Dr. Beck's functional capacity evaluation indicated that plaintiff could perform the duties of a production supervisor with only minimal restrictions, plaintiff requested, and contends she was entitled to receive, accommodations from defendant for her medical condition, but that defendant failed to satisfy her request.[25]

---

[19] *Id.*

[20] *Id.*

[21] *Id.*, Exhibit C (Sommerset deposition), at 32-34.

[22] *Id.*, Exhibit K (Fuller affidavit), at ¶ 5.

[23] *Id.*, Exhibit L (Pace affidavit), at ¶ 2.

[24] *Id.*, Exhibit K (Fuller affidavit), at ¶ 7.

[25] *Id.*, Exhibit A (plaintiff deposition), at 129.

7

### 1.    Use of a riding cart

At one time, defendant provided all supervisors with riding carts, to facilitate travel between and within departments.  As a supervisor in Department 47, plaintiff was entitled to use the cart as a mode of transportation during her work shift.  Plaintiff admitted the cart allowed her to drive *around* Department 47, but denied that it fully accommodated her disability, because it was too large to drive "in between" the machinery.[26]  She stated, "[i]f a machine was broken down, you had to get off the cart [to] cut in between machines.  Them machineries [sic] are packed so compact in the area, you can't take a cart in."[27]

Plaintiff testified that defendant subsequently prohibited supervisors from using carts.[28]  She could not specify the date this occurred, but said that, after the prohibition went into effect, she specifically requested permission to continue use of a cart.[29]  Her request was not honored.[30]

### 2.    Plaintiff's request to be transferred  to a "sit down" position

Plaintiff also requested transfer to a position which would not require her to be on her feet.  In response, defendant placed plaintiff, on a temporary basis, in a shipping and receiving supervisory position which entailed less standing and walking than a production supervisor.[31]  This move took place in December of 1998.  In this position, plaintiff was "allowed to sit and/or stand as needed and was also allowed to rest as often as she wished, based on how she felt."[32]  Even so, plaintiff alleged that pain in her knees rendered her unable to meet the demands of the position.[33]  Moreover, plaintiff

---

[26] *Id.*

[27] *Id.*

[28] *Id.* at 166-67.

[29] *Id.* at 242-43.

[30] *Id.*

[31] *Id.*, Exhibit K (Fuller affidavit), at ¶ 4

[32] *Id.*

[33] *Id.*, Exhibit A (plaintiff deposition), at 196.

8

failed to show up for work so frequently that defendant could not hold the position open for her permanently.[34]

After her brief stint in shipping and receiving, plaintiff again attempted to perform her regular duties as a production supervisor, but with little success.[35] Plaintiff continued to frequently call-in or leave work early between January and July of 1999, claiming that she was unable to work.[36] She last attempted to work in July of 1999.[37] Since that time, she has received 60% of her salary pursuant to defendant's sickness and accident disability plan.[38]

She has contacted defendant's human resource department on a few occasions since July of 1999, saying that she still is unable to work.[39] Plaintiff testified that she needs a "desk job," and that she is waiting to be offered one by defendant.[40] In January of 1999, Harry Fuller explained to plaintiff that there were very few "sit down" jobs at the Athens facility. Fuller asked whether plaintiff would be interested in obtaining a desk job at the national headquarters in Michigan. Plaintiff declined this offer, saying that she did not want to leave Alabama.[41] In May of 2000, plaintiff was offered a position as dispatcher at the Athens facility. According to Fuller, this was the first time a sedentary position which plaintiff was qualified to perform had become vacant.[42] Although these positions are typically filled by contract employees, defendant reached an agreement with the contracting agency to "free up two dispatcher positions" by cancelling the contract without

---

[34] *Id.*, Exhibit K (Fuller affidavit), at ¶ 4

[35] *Id.*, Exhibit A (plaintiff deposition), at 164-65.

[36] *Id.*, Exhibit K (Fuller affidavit), at ¶ 8.

[37] *Id.*, Exhibit A (plaintiff deposition), at 91.

[38] *Id.*

[39] *Id.* at 146.

[40] *Id.* at 147-148.

[41] *Id.*, Exhibit K (Fuller affidavit), ¶ 7.

[42] *Id.* at ¶ 18.

penalty.[43]  Fuller testified, and plaintiff does not dispute, that the dispatcher position is "the closest [position] we have to a 'sit down' job."[44]  Plaintiff, nevertheless, refused the offer.[45]

### F.  Male Employees Whose Impairments Were Accommodated

Plaintiff also alleges that defendant refused to reasonably accommodate her medical condition because of her gender.  As support for this contention, plaintiff points to three male employees who, she claims, *were* afforded reasonable accommodations for their disabilities.  She claims that Roger Williams, a supervisor in Department 54, was placed in a newly created position of "attendance coordinator" to accommodate his work restrictions.[46]  After injuring his knee at work and undergoing knee replacement surgery, Williams' orthopedic surgeon restricted him from being on his feet for the majority of his shift.[47]  The "attendance coordinator" position fell within his physician's restrictions, but it was not a sedentary position.[48]

Plaintiff next points to Ben Day, a supervisor in Department 35 who also underwent knee replacement surgery which required a significant amount of recovery time.[49]  After recuperating at home for eight weeks, Day asked Harry Fuller in Human Resources whether there were any jobs he could perform while still recuperating from surgery.[50]  Fuller informed Day that he would look into the matter, and asked Day to provide a copy of any work restrictions imposed by his physicians.  Despite this request, Day did not deliver any work restrictions from his physicians to anyone at

---

[43] *Id.* at ¶ 18.

[44] *Id.*

[45] *Id.*

[46] *Id.*, Exhibit J (Williams deposition), at 10-12.

[47] *Id.* at 11-12.

[48] *Id.*, Exhibit K (Fuller deposition), at ¶ 13.

[49] *Id.*, Exhibit H (Day deposition), at 9, 26.

[50] *Id.*

defendant's facility.[51]  Even so, he was offered, and agreed to work at, various positions while recuperating from surgery.  He was initially assigned to miscellaneous clerical duties in the production control and logistics group.[52]  Then he temporarily filled a coordinator's position where he conducted cost recovery activities with suppliers.[53]  Neither of these jobs were sedentary positions.  Day was ultimately placed in shipping and receiving, as a receiving supervisor.[54]

Finally, plaintiff identifies Jim Gibson, superintendent of a department called "site central."[55] After Gibson suffered a heart attack, his physician restricted his work activities to 40 hours a week, and no more than 3-4 hours standing or walking.[56]  Members of defendant's medical staff reviewed and approved these restrictions.[57]  Gibson is able to work within these restrictions at site central.[58]

### III. DISCUSSION

Plaintiff has produced no direct evidence that defendant intended to subject her to disparate treatment, either because of her gender, or because of her disability.  When evaluating employment discrimination claims supported by circumstantial evidence, courts are guided by the familiar analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), and then elaborated in its progeny.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *McDonnell*

---

[51] *Id.* at 28.

[52] *Id.* at 27.

[53] *Id.* at 9.

[54] *Id.* at 8-9.

[55] *Id.*, Exhibit G (Gibson deposition), at 10-11.

[56] *Id.* at 11.

[57] *Id.* at 11-12.

[58] *Id.* at 12-13.

*Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6.

**A.     Plaintiff's Sex Discrimination Claim**

To establish a prima facie case of disparate treatment on the basis of gender, a plaintiff "must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job." *Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).

Here, the plaintiff cannot establish the third element of a prima facie case, because the alleged male comparators were not similarly situated.

"To make a comparison of the plaintiff's treatment to that of [male] employees, the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). When determining whether a plaintiff has made such a showing, "a court must look at all relevant factors, the number of which depends on the context of the case." *Randue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).

In the context of the present controversy, two significant areas of inquiry are:  whether plaintiff and her male comparators were subject to the same workplace rules and standards, *see, e.g., Sanguinetti v. United Parcel Service, Inc.*, 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000), *aff'd*, 254 F.3d 75 (11th Cir. 2001); and, whether they dealt with the same supervisor. *See, e.g., Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989); *Randue*, 219 F.3d at 618 ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently."); *Gaston v. Home Depot USA, Inc.*, 129 F.

Supp. 2d 1355, 1369 (S.D. Fla. 2001) ("[A]lthough not necessarily dispositive, failure to show a

common supervisor is a strong factor, depending on context, against a finding that employees are

similarly situated.").[59]

The relevant facts concerning plaintiff can be summarized as follows:

(1)     The restrictions imposed by Dr. Beck following physical examination and a
        functional capacities evaluation were minimal. He determined that plaintiff could
        work within his restrictions as a production supervisor.[60]  Plaintiff's personal
        physician agreed that Dr. Beck was better qualified to determine plaintiff's

---

[59] In *Anderson v. WBMG-42*, 253 F.3d 561 (11th Cir. 2001), the Eleventh Circuit rejected the argument that the involvement of different supervisors means, as a matter of law, that a plaintiff and her alleged comparators cannot be similarly situated.

> We also reject WBGM's position that *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) and *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998, *opinion modified by* 151 F.3d 1321 (1998), stand for the proposition that whenever two different supervisors are involved in administering the disciplinary actions, the comparators cannot as a matter of law be similarly situated for Title VII purposes. Because in both *Gerwins* and *Bessemer* this Court found that similarly situated evidence could not be demonstrated, WBMG argues that a plaintiff cannot prevail as a matter of law whenever two different supervisors are involved in disciplining the plaintiff and comparators. Neither of these cases, however, support such a broad assertion. *Bessemer* specifically indicated evidence of different supervisors' involvement in the disciplinary process is not determinative of the question. 137 F.3d at 1312 n.7 ("Different supervisors may have different management styles that — *while not determinative* — could account for the disparate treatment that employees experience.") (emphasis added). In *Gerwins*, we said that, under the circumstances there, different supervisors "*may* not be comparable" for the purposes of Title VII analysis. 874 F.2d at 1541 (emphasis added). Out rationale, however, was reflective of the cases upon which we relied:
>
> > See *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1271 (6th Cir. 1986) ("Although a change in managers is not a defense to claims of race or sex discrimination, it can suggest a basis other than race or sex for the difference in treatment received by two employees"); *Tate v. Weyerhauser*, 723 F.2d at 605-06 ("Although a change in managers is not a defense to claims of racial discrimination," evidence that one manager is more lenient than another may explain differential application of sanctions to whites under one manager and blacks under another); *Lynch v. Dean*, 39 FEP Cases 338, 345 (M.D. Tenn. 1985), *rev'd on other grounds*, 817 F.2d 380 (6th Cir. 1987) ("Proof that workers under [one foreman's] supervision were disciplined more severely than workers under the supervision of other foremen does not aid plaintiff in insisting that she was the victim of selective enforcement of the rules").
>
> *Gerwens*, 874 F.2d at 1541.

*Anderson*, 253 F.3d at 565-66 (emphasis in original). In *WBMG*, the comparators were similarly situated because all of the employees in question were "within the primary responsibility of one middle manager and the same supervisory chain of command." *Id.* The plaintiff in the present action, however, has not demonstrated that she shared any supervisors, or fell within the same chain of command as any of her comparators.

[60] Defendant's evidentiary submission (doc. no. 50), Exhibit K (Fuller affidavit), exhibit B (Dr. Beck report).

13

restrictions.[61]

(2)     Plaintiff nevertheless disputed Dr. Beck's conclusion, informed defendant that she could not work at her position, and ultimately stopped showing up for work.[62]

(3)     Plaintiff has been absent from work for more than two of the last four years.[63]

(4)     Plaintiff asserts that she needs a sedentary ("sit down") position.[64]  When such a position was offered in May of 2000, she refused to accept it.[65]

(5)     Plaintiff's supervisor at all relevant times was Buddy Dyar.[66]

The pertinent facts relating to comparator Roger Williams are as follows:

(1)     Following his eleventh knee surgery, Williams was restricted from standing more than fifteen minutes at a time, and from walking more than four hours during his shift.[67]

(2)     Those restrictions rendered him unable to meet the demands of his production supervisor position, and he was transferred to the position of attendance coordinator.[68]

(3)     Williams was willing and able to work within his restrictions as an attendance coordinator.[69]

(4)     The position is not sedentary.[70]

(5)     Williams was reassigned to the attendance coordinator position by his supervisor, Mark McClanahan.[71]

The relevant facts relating to comparator Ben Day are as follows:

---

[61] *Id.*, Exhibit C (Sommerset deposition), at 32-34.

[62] *Id.*, Exhibit K (Fuller affidavit), at ¶3.

[63] *Id.* at ¶¶ 3, 8.

[64] Defendant's evidentiary submission (doc. no. 50), Exhibit A (plaintiff deposition), at 273-274.

[65] *Id.*, Exhibit K (Fuller affidavit), at ¶ 18.

[66] *Id.*, Exhibit F (Dyar deposition), at 15-16.

[67] *Id.*, Exhibit J (Williams deposition), at 14.

[68] *Id.* at 12.

[69] *Id.* at 12-13.

[70] *Id.*, Exhibit K (Fuller affidavit), at ¶ 13.

[71] *Id.*, Exhibit J (Williams deposition), at 11-12.

14

(1)     Prior to undergoing knee replacement surgery in August of 1997, Day worked as a manufacturing supervisor in Department 35.  He held this position on a temporary basis.[72]

(2)     Following surgery, Day was on medical leave for approximately eight weeks.  While on leave, defendant filled Day's manufacturing supervisor position with a permanent placement.[73]

(3)     Upon his return to work, Day assumed a coordinator's position, where he conducted cost recovery activities with suppliers.  He was assigned to this position by his supervisor Jim Washington.[74]

(4)     Approximately five months later, Day was transferred to a supervisory position in shipping and receiving.  He was assigned to this position by his supervisor Jim Washington.[75]

(5)     Day is currently working without restrictions.[76]

(6)     None of the positions held by Day were sedentary.[77]

The relevant facts pertaining to comparator Jim Gibson are as follows:

(1)     Following a heart attack, Gibson was restricted to working forty hours a week, with three to four hours standing/walking.[78]

(2)     The longest period Gibson was on leave following his heart attack was three months.[79]

(3)     Following his return to work, defendant reassigned Gibson to the position of site central supervisor, because his prior position had been filled by another employee. He was willing and able to work within his restrictions in the site central position.[80]

(4)     The record does not identify Gibson's supervisor at relevant times, nor who transferred him to the site central position.

---

[72] *Id.*, Exhibit H (Day deposition), at 18.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.* at 28.

[77] *Id.* at 19; *see also id.*, Exhibit K (Fuller affidavit), at ¶ 13.

[78] *Id.*, Exhibit G (Gibson deposition), at 11.

[79] *Id.* at 10.

[80] *Id.* at 13.

(5)     The position is not sedentary.[81]

The facts thus reveal several glaring differences between plaintiff and her comparators. Unlike plaintiff, Gibson and Williams were willing and able to work within their restrictions, while Day had no restrictions placed on his work abilities. Unlike plaintiff, all comparators were willing to return to work in some capacity; not one has been absent from work for as long as plaintiff. While plaintiff contends that she can perform only sedentary or desk jobs, not one of her comparators sought or was assigned to such jobs. Finally, plaintiff has not established that the comparators dealt with the same supervisor. Day and Williams were reassigned to their new positions by supervisors different from plaintiff's; and, plaintiff failed to identify Gibson's supervisor, or who reassigned him to his new position. In sum, plaintiff has not demonstrated that these men were comparable to her in all relevant respects, and she accordingly cannot satisfy the third element of a prima facie case. Summary judgment therefore is due to be entered in favor of defendant on plaintiff's Title VII disparate treatment claim.

**B.     Plaintiff's ADA Claim**

To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that she has a "disability" within the meaning of the Act; (2) that she is "a qualified individual with a disability," meaning that she can perform the essential functions of the employment position she holds or seeks, with or without reasonable accommodation being made by the employer;[82] and, (3) that she suffered an adverse employment action because of her

---

[81] *Id.* at 12-13.

[82] *See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

16

disability.[83] *See, e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445, 1454 (11th Cir. 1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)).[84]

The ADA defines the concept of "disability" three ways — that is, as including any person: (A) who has a "physical or mental impairment" that "substantially limits" one or more of the "major life activities" of such person; or (B) who has a "record" of such an impairment; or (C) who is "regarded" as having such an impairment. 42 U.S.C. § 12102(2); *see also* 29 C.F.R. § 1630.2(g). "An individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these three enumerated definitions." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

Although the ADA does not define either the phrase "substantially limits," or "major life activities," the Eleventh Circuit has held that "courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ... for guidance." *Gordon*, 100 F.3d at 911

---

[83] There actually is a fourth element, implicit in the interstice between the second and third: *i.e.*, "a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996) (per curiam)).

[84] *See also, e.g., Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir. 1996) ("In order to establish a prima facie case under the Americans with Disabilities Act of 1990, ... Prichard must show that: 1) she has a disability, 2) she is a qualified individual, and 3) she was discriminated against because of the disability"); *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 348 (4th Cir. 1996) ("To establish a cause of action under the ADA, a plaintiff must demonstrate: '(1) that [s]he has a disability; (2) that [s]he is otherwise qualified for the employment or benefit in question; and (3) that [s]he was excluded from the employment or benefit due to discrimination solely on the basis of the disability'"); *McKay v. Toyota Motor Manufacturing*, 110 F.3d 369 (6th Cir. 1997) ("A party seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability").

(citations omitted). Implementing regulations instruct that the phrase "substantially limits" means a plaintiff either is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

"Major life activities" are defined by another regulation as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The Appendix to that section elaborates on that definition in the following manner:

> This term adopts the definition of the term "major life activities" found in the regulations implementing section 504 of the Rehabilitation Act at 34 CFR part 104. "Major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. This list is not exhaustive. For example, other major life activities include, but are not limited to, sitting, standing, lifting, reaching.

29 C.F.R. Part 1630, App. § 1630.2(i) (citations omitted). When comparing a plaintiff's ability to perform "major life activities" with the abilities of an average person in the general population, there must be more than a mere difference in abilities. Rather, a plaintiff must show that her impairment causes "limitations that are in fact substantial." *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S.Ct. 2162, 2168, 144 L.Ed.2d 518 (1999).

Thus, the determination of whether an individual has a disability is not necessarily based on a diagnosis that plaintiff suffers from a physical or mental impairment; rather, the decision is an individualized inquiry, focused upon the effects that the impairment has on the plaintiff's life. *See*

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83, 119 S.Ct. 2139, 2146-47, 144 L.Ed.2d 450

(1999); *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 n.3 (11th Cir. 1996).

In this case, plaintiff suffers from fibromyalgia and osteoarthritis. She contends that the

symptoms associated with these conditions — *i.e.*, soreness, swelling, and pain in the joints,

headaches and insomnia[85] — substantially limit her ability to engage in the major life activities of

walking and standing. Plaintiff's personal physician testified that plaintiff's impairments

substantially limit the amount of walking she can safely accomplish.[86] Plaintiff testified to various

aspects of her life where her ability to walk and stand has been limited. For example, she testified

that she can no longer garden, and requires assistance from her husband to complete basic

housework, such as laundry.[87] She also testified that simply walking causes her great pain.[88]

Standing in stark contrast to plaintiff's deposition testimony is the independent medical evaluation

by Dr. Beck, whose notes record that plaintiff gave him a different account of her abilities.

> The patient states that she works out in a gym, biking 15-20 minutes at a
> time, walking 15-20 minutes at a time, and doing aerobics of one hour's duration two
> to three times per week. She is not engaged in weight-lifting. She is independent in
> activities of daily living. She can do light housework, laundry, and cooking. She
> drives a car and drove here today from Madison.[89]

Assuming, as the court must, that plaintiff has nevertheless demonstrated the existence of a genuine

issue of material fact on the question of whether she is disabled within the meaning of the ADA, the

court finds that defendant still is entitled to summary judgment, because plaintiff has not established

that she is a "qualified individual with a disability."

---

[85] *See supra* note 5. Plaintiff's personal physician, Dr. Sommerset, said: "[m]y impression is that she is at present disabled because of her headaches so I think it would be very difficult for her to carry out a job that is more than just very sedentary." Plaintiff's evidentiary submission (doc. no. 53), Exhibit 4 (Slaughter deposition), at 17.

[86] Defendant's evidentiary submission (doc. no. 50), Exhibit C (Sommerset deposition), at 42, 45, 46.

[87] *Id.*, Exhibit A (plaintiff deposition), at 44, 45.

[88] *Id.* at 46.

[89] *Id.*, Exhibit K (Fuller affidavit), exhibit B (Dr. Beck report).

A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

The employer "must provide reasonable accommodations for known disabilities unless doing so would result in an undue hardship to the employer." *Gordon*, 100 F.3d at 910 (citing 42 U.S.C. § 12112(b)(5)(A)). "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables an employee to perform the essential functions of the job." *Lucas*, 257 F.3d at 1255-56 (citations omitted). "Essential functions are 'the fundamental job duties of the employment position the [disabled employee] holds or desires." *Id.* at 1258.

In the Eleventh Circuit, it is the ADA plaintiff — not the employer — who bears the twin burdens of identifying an accommodation, *and*, establishing that the suggested accommodation is reasonable — that is, will allow the plaintiff to perform the essential functions of the position she holds or seeks. *See Lucas*, 257 F.3d at 1255-56; *Reed*, 206 F.3d at 1062; *Stewart*, 117 F.3d at 1285; *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997).[90]

When a plaintiff fails to identify and suggest a specific accommodation, therefore, the employer's failure to investigate possible reasonable accommodations, or to engage in an "interactive process" with the plaintiff, with the aim of identifying possible accommodations, "is unimportant." *Willis*, 108 F.3d at 285; *Lucas*, 257 F.3d at 1256 n.2 (same); *accord Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999) (summary judgment is appropriate where the

---

[90] *Willis* held, as a matter of first impression within the Eleventh Circuit, that "an ADA plaintiff (1) as part of her burden of production, must identify an accommodation that would allow her to perform her job duties and (2) as a part of her burden of proving her case, must establish that such an accommodation is reasonable." *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997) (per curiam). In doing so, the court rejected the contention that the ADA "merely requires an employee to request accommodation — as an abstract concept — after which the employer becomes obligated to enter into a 'flexible, interactive process' involving both the employer and employee." *See also Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 n.2 (11th Cir. 2001).

20

plaintiff fails to identify a reasonable accommodation that the employer refused to provide). "No language in the ADA mandates a pretermination investigation," and, "the ADA provides no cause of action for 'failure to investigate' possible accommodations." *Willis*, 108 F.3d at 285 (citing *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 448 (11th Cir. 1996)).

Plaintiff failed to carry her burdens of identifying an accommodation, and, demonstrating that the suggested accommodation would allow her to perform the essential functions of the position she held or sought. She testified that she is unaware of any accommodation that would allow her to perform the duties of a production supervisor.[91] Plaintiff argues that she "indicated that she could perform the essential functions of her job at Delphi if she were given a buggy which could fit in between the machinery in her department ...."[92] Nothing in the record, however, suggests that plaintiff told anyone that she needed a smaller riding cart. Rather, when defendant prohibited supervisors from using carts, plaintiff simply requested that she be allowed to continue using her same cart, despite the asserted fact that it would not fit between machinery.[93]

Plaintiff also contends that she could continue working for defendant if she were reassigned to a sedentary position.[94] In particular, plaintiff claims that defendant could and should have placed her in the position of "Human Resources Representative."[95] That move, however, would have constituted a promotion for plaintiff based upon salary.[96] An employer may be required to "reassign" a disabled employee, but is not required "to bump another employee from a position in order to accommodate a disabled employee," or to promote a disabled employee. *Lucas*, 257 F.3d at 1256.

---

[91] Defendant's evidentiary submission (doc. no. 50), Exhibit A (plaintiff deposition), at 130-32.

[92] Plaintiff's brief in opposition to defendant's motion for summary judgment (doc. no. 59), at 28-29.

[93] Defendant's evidentiary submission (doc. no. 50), Exhibit A (plaintiff deposition), at 243-45.

[94] *Id.* at 113-115.

[95] Plaintiff's brief in opposition to defendant's motion for summary judgment (doc. no. 59), at 31-33.

[96] Defendant's evidentiary submission (doc. no. 50), Exhibit K (Fuller affidavit), at ¶ 11.

One court has articulated a plaintiff's burden as follows:

> In such a failure-to-transfer case, the plaintiff bears the burden of demonstrating: (1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of the job with reasonable accommodation.

*Sturm v. UAL Corp.*, No. CIV. A. 98-264, 2000 WL 1300396, at *12 (D.N.J. Sept. 5, 2000) (quoting

*Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000)).

Although plaintiff identifies only the Human Resources Position by name, the record discloses a number of vacant, funded positions at defendant's facility. Over a three month period in 2000, defendant posted openings for a senior buyer, a senior quality/reliability engineer, and a supply quality engineer.[97] Plaintiff, however, has not demonstrated that she is qualified to perform the essential duties of these jobs, because each requires "walking or standing at least 50% of the time."[98] In May of 2000, defendant filled an opening for an attendance coordinator.[99] Plaintiff was not qualified for this position either, because, once again, it required "a considerable amount of walking from [the] office out to the floor."[100]

Since July of 1999, defendant has posted openings for six supervisory positions at Level Six or higher.[101] As a Level Five supervisor, defendant could reassign plaintiff to these positions only through a promotion, which (as previously noted) the ADA does not require.[102] In December of 1998, defendant placed plaintiff, on a temporary basis, in a shipping and receiving supervisory position. In this position, plaintiff was "allowed to sit and/or stand as needed and was also allowed

---

[97] *Id.* at ¶ 15.

[98] *Id.* at ¶ 16.

[99] *Id.* at ¶ 13.

[100] *Id.*

[101] *Id.* at ¶ 14.

[102] *Id.*

to rest as often as she wished, based on how she felt."[103]  Despite defendant's apparent attempt to accommodate plaintiff, she was unable to perform her duties in this position.  Plaintiff alleged that pain in her knees rendered her unable to meet the demands of this position.[104]  Moreover, plaintiff failed to show up for work so frequently that defendant could not hold this position open for her permanently.[105]

In May of 2000, plaintiff was offered a position as a dispatcher, which is "the closest [defendant] ha[s] to a 'sit down' job."[106]  Plaintiff, however, did not accept this position.[107]

In sum, plaintiff has failed to identify an accommodation and demonstrate that the accommodation would allow her to perform the essential functions of any job.  Thus, she is not a qualified individual under the ADA.

Alternatively, the court concludes that plaintiff is not a "qualified individual" under the ADA because she failed to meet the attendance requirements of her job.  "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."  *Gore v. GTE South, Inc.*, 917 F. Supp. 1564, 1572 (M.D. Ala. 1996) (quoting *Tyndall v. National Education Centers*, 31 F.3d 209, 211 (4th Cir. 1994)).  It does not matter that the employee's absences are due to the employee's disability or the disability of a family member.  *Tyndall*, 31 F.3d at 211.  "The issue is whether, as a matter of law, [the plaintiff] is able to meet the essential requirement of regular, dependable attendance on the job, so that she is a

---

[103] *Id.*

[104] *Id.*, Exhibit A (plaintiff deposition), at 196.

[105] *Id.*, Exhibit K (Fuller affidavit), at ¶ 4

[106] *Id.* at ¶ 18.

[107] *Id.*  Plaintiff asserts that she accepted this job through written correspondence, copies of which are attached to her brief.  Plaintiff's brief in opposition to defendant's motion for summary judgment (doc. no. 59), at 29 n.142.  The court, however, cannot consider this evidence because it was not timely filed in the clerk's office.  *See* Submission Order (doc. no. 48).

'qualified' individual within the meaning of the ADA." *Gore*, 917 F.Supp. at 1572.  When

attendance is an essential element of the job, an employer is not required to offer any

accommodation to an employee who has an excessive number of unpredictable absences. *Jackson*

*v. Veterans Administration*, 22 F.3d 277, 279 (11th Cir. 1994), *cert. dismissed*, 513 U.S. 1052, 115

S.Ct. 657, 130 L.Ed.2d 560 (1994); *Gore*, 917 F. Supp. at 1573.

Plaintiff alleges that she could perform the essential functions of her job if she were "allowed

adequate time off from work to address her medical condition."[108]  Nothing in the record suggests

that plaintiff would be able to perform the essential functions of her job as supervisor even if she

was allowed additional time off.  Plaintiff relies on the testimony of Dr. Sommerset to support her

claim that defendant denied her adequate time off.[109]  Dr. Sommerset, however, simply speculated

that plaintiff was bothered by defendant's request that plaintiff return to work while undergoing

physical therapy.[110]  Sommerset did not state that additional time off would have enabled plaintiff

to perform the essential functions of her job as supervisor.

Attendance constitutes an essential element of plaintiff's job as supervisor because

attendance is necessary to perform the duties of ensuring that component production schedules are

met, scheduling employee work shifts, assisting in employee discipline, and walking through the

department, to more effectively assist employees and ensure that the machines are running

properly.[111]  During her employment with Delphi, plaintiff's attendance at the job site has been

excessive, sporadic, and unpredictable.  Since beginning work with Delphi in August of 1996,[112]

---

[108] Plaintiff's brief in opposition to defendant's motion for summary judgment (doc. no. 59), at 28-29.

[109] *Id.* at 35.

[110] Defendant's evidentiary submission (doc. no. 50), Exhibit C (Sommerset deposition), at 46-47.

[111] Defendant's evidentiary submission (doc. no. 50), Exhibit A (plaintiff deposition), at 87-89, 122.

[112] Complaint (doc. no. 1), at ¶ 11.

plaintiff has missed in excess of *two years of work*.[113]  In addition, plaintiff has called in sick, or left work early on numerous occasions.[114]

### IV. CONCLUSION

For the foregoing reasons, this court concludes that defendant's motion for summary judgment is due to be granted with respect to all of plaintiff's claims.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this the ___5th___ day of October, 2001.

_____
United States District Judge

---

[113] Defendant's evidentiary submission (doc. no. 50), Exhibit K (Fuller's affidavit), at ¶¶ 3, 8.

[114] *Id.* at ¶ 8.